Lee T. FORD, Jr., et al. (Plaintiffs), Respondents,

v.

Ernest BOYD and J. W. Giesler, etc. (Defendants), Appellants.

No. 29510.

St. Louis Court of Appeals.

Missouri.

Feb. 5, 1957.

Rehearing Denied March 5, 1957.

---

Robert A. Hamilton, Herbert F. Hahn, St. Louis, for appellants.

Rader, Love & Falzone, Clayton, for respondents.

JAMES D. CLEMENS, Special Judge.

This is a suit by plaintiffs, thirty-five lot owners in a subdivision, for removal of the two defendants as trustees under a restriction indenture covering the subdivision. The trial court granted the relief prayed and appointed two successor trustees, and the defendants appeal. The issue here is whether the conduct of

defendants warrants their removal as trustees. The case is here for trial de novo and we must weigh the evidence ourselves, but will be inclined to defer to the findings of the trial court on close issues of conflicting evidence. Cleary v. Cleary, Mo., 273 S.W.2d 340, loc. cit. 346.

"Green Acres" is a subdivision now containing 35 acres located in the city of Bellefontaine Neighbors, St. Louis County. It is composed of land owned by defendant Boyd or family-owned corporations which he controls. Unit One thereof was platted into lots in 1929; Unit Two was so platted in 1939 and Unit Three in 1951. These three units contain some forty platted building lots and, together with the roads and parks thereof, comprise only 44% of Green Acres. The other 56% is still owned by defendant Boyd and is not yet platted into building lots but is composed of several acreage tracts, including one of 2½ acres upon which Mr. Boyd's own home is located.

In 1939, prior to the building of any homes in Green Acres, Mr. Boyd subjected the entire 35-acre tract to an indenture which, among other things, created a board of trustees composed of Mr. Boyd, one Bourne and one Brennan. So far as pertinent to the opinion, this indenture dedicated streets and parks, provided for the appointment of successor trustees by those remaining, provided for the election of trustees by the lot owners after more than half the land had been sold, and established restrictions as to the size of lots and location and type of homes and utilities which could be built thereon after approval of plans by the trustees. The trustees were empowered:

(a) To repair, maintain, and/or reconstruct streets, roads, lanes, courts, parkways, parks, and any other open spaces.

(b) To provide for sweeping and cleaning of the streets, the collection, and disposal of street sweepings, ashes, rubbish, garbage and the like, and to require incinerators or other disposal of garbage satisfactory to the Board of Trustees.

(c) To do any and all lawful things which the Board of Trustees may deem advisable to be done under or by virtue of this declaration, and to do and perform any and all lawful acts which may be necessary for, or incidental to the peace, health, comfort, safety or general welfare of the inhabitants and/or the owners thereof.

(d)     *     *     *     *

(e) To levy assessments and create and enforce liens upon any and all lots in said tract covered hereunder for the payment of the costs and expenses as provided immediately above, which costs and expenses shall be apportioned by the Board of Trustees against the owner or owners of the property benefited, and the owner shall be required to pay said cost at such time or times as may be determined by the Board of Trustees, provided, however, that there shall be a maximum charge of $60.00 per lot per year, unless a subsequent declaration or instrument increasing such maximum assessment is duly signed by at least two-thirds of all the lot owners and/or property owners of said tract of land covered hereunder and filed for record with the Recorder of Deeds for St. Louis County, Missouri.

This last power was implemented by spelling out the manner in which the trustees were to notify lot owners of the assessments and were to record and reduce the assessments to liens if not paid.

In 1948 two vacancies occurred on the original board of trustees. Mr. Boyd called a meeting of the lot owners and had them nominate two successors whom he then appointed as trustees. This also occurred on later occasions and then, in October of 1952, defendant Giesler and one Wilbert A. Charity, both lot owners in

Green Acres, were similarly nominated and appointed. Mr. Charity is not a party to this suit but he appeared as a witness for plaintiffs.

As grounds for removal of the defendant trustees, plaintiffs alleged, inter alia, that defendants did not hold regular meetings, did not maintain records of their proceedings, failed to levy equitable assessments against the lands of Green Acres, permitted construction of residences without approval of plans and permitted lot owners outside Green Acres to use their private road. Plaintiffs' evidence tended to support these allegations and the trial court's decree made findings in favor of the plaintiffs and then decreed:

"11. Wherefore, It Is Ordered, Adjudged and Decreed by the Court that the defendants, and each of them, are hereby removed from their offices as trustees.

"12. It Is Further Ordered, Adjudged and Decreed that the defendants, or either of them, are forever barred and enjoined and restrained from exercising any duty or function of the office of trustee under the said Restriction Indenture.

"13. It Is Further Ordered, Adjudged and Decreed that Clarence E. Schuettenberg, 24 Green Acres and Joseph E. Wall, 18 Green Acres are hereby appointed as Trustees of the said Restriction Indenture, to serve until their death, resignation or removal by a court of lawful jurisdiction, or until the first election required by the said Restriction Indenture, or until their successor is duly elected or appointed and shall have qualified."

The trustees held title to the streets and parks in Green Acres and were empowered to maintain them, to levy assessments and to control construction, all for the benefit of the land owners in Green Acres. Although a trustee is not to be re-

moved for mere errors of judgment nor for a trivial breach of trust, he does owe a duty to the beneficiaries to act with utmost integrity and loyalty and is subject to removal for failure to do so. Boland v. Mercantile-Commerce Bank & Trust Co., 349 Mo. 731, 163 S.W.2d 597; Bilton v. Lindell Tower Apartments, 358 Mo. 209, 213 S.W.2d 952; White v. Hughes, Mo.App., 88 S.W.2d 268. The trust property and the rights of the beneficiaries under the Green Acres restriction indenture were in the nature of a fund held by the trustees and "the safety of the trust fund is the first care of the law, and on this depends every rule which has been made for the conduct of trustees." Therrien v. Mercantile-Commerce Bank & Trust Co., 360 Mo. 149, 227 S.W.2d 708, 710. With these equitable principles as our pole star, we look now to the evidence of defendants' conduct. Five facets thereof will be covered: the keeping of records, the levy of assessments, the use of Green Acres Road by non-residents of Green Acres, the construction of dwellings without prior approval of plans and the atmosphere existing between the trustees and the plaintiffs.

With regard to records of the proceedings of the trustees, plaintiffs' evidence showed that no trustee had kept records of the proceedings of meetings of the trustees and none existed, and that business of the trustees was conducted sporadically, often by two trustees without effort to consult the third. Defendants' evidence did not substantially contradict plaintiffs' in these matters and we find plaintiffs' evidence to be true.

As to the levy of assessments, the plaintiffs' evidence showed that each year the trustees somehow arrived at the amount of money desired and this amount was prorated on an area basis among certain of the lots in Green Acres; that no formal assessment was made and the only record thereof was a book with a separate sheet showing the amount due for each tract; that land still owned by Mr. Boyd, over

half of the area of Green Acres, was never included among the tracts so assessed by the trustees, although all other tracts were included. Defendants' evidence was that Mr. Boyd did not consider that his land was subject to assessment until it was platted into lots and that it was not "benefited" until that time. Mr. Boyd's 2½-acre home tract was at the corner of Green Acres and although it adjoined "Green Acres Road" he did not use it and contended that this home tract derived no benefit from the money raised. Plaintiffs' evidence showed that Lots 1, 2 and 3 did not abut Green Acres Road either but they were regularly assessed by the trustees; and also that Lots 43, 44, 46 and 47, although platted in 1951, had never been assessed by the trustees against Mr. Boyd who owned them. We find from the evidence that defendants laxly determined the amount of money to be raised annually and that they made assessments without due regard to the extent to which the respective tracts were benefited and, particularly, in a manner calculated to avoid payment of assessments by Mr. Boyd.

Green Acres Road runs east and west along the southerly part of Green Acres. To the north of the road lay Lots 3 to 7. On the south side of the road lay a strip thirty feet wide and some 500 feet long. Mr. Boyd owned land lying south of and outside Green Acres bordering this thirty-foot strip. In 1954 Mr. Boyd subdivided this other land, with four lots thereof fronting to the north and assigned to each of the four lots a segment of this 30′ by 500′ strip. Thus, each of the four lots included a portion of Green Acres and thereby fronted on the south side of Green Acres Road. Plaintiffs' evidence on this issue was that two of them had specifically been told when buying their lots that the thirty-foot strip was a parkway, that money raised by assessments had been used for several years to maintain the strip and also to re-surface the roadway, and that they had objected to the trustees about the use of Green Acres Road by persons whose

homes lay outside of Green Acres. Defendants' evidence was that the strip had never been designated as a parkway; that the four lots were platted subject to the restrictions of Green Acres; that two of the lots which had been sold by Mr. Boyd had been assessed but that the two unsold lots had not. We find from this evidence that the location of the thirty-foot strip, lying as it did between Green Acres Road and the south boundary of Green Acres, was such that when plaintiffs purchased their lots they had reason to believe that it was for park use and that this belief was fostered by the trustees in maintaining the strip at the lot-owners' expense; that in so subdividing the strip and making Green Acres Road available to his purchasers, Mr. Boyd used his position as trustee to further his individual interest at the expense of plaintiffs and other lot owners in Green Acres.

As to the construction of dwellings without prior approval of plans, it was conceded that in March of 1954 Mr. Boyd conveyed five vacant building lots to Oakville Acres, Inc., so that dwellings could be built thereon. Mr. Boyd received no cash but took second deeds of trust payable upon completion and sale of the dwellings. In November of 1954 the builder submitted plans for two dwellings to Mr. Boyd, who took them to Mr. Giesler and Mr. Charity and they in turn approved the plans. Thereafter, the builder took plans for the other three dwellings to Mr. Boyd who told the builder to "go ahead", and construction began, without approval by the other two trustees. Mr. Boyd explains that he meant only for the builder to "go ahead" and get approval of the other trustees. This situation prompted the other lot owners to petition the trustees for a meeting, which was held February 7, 1955. Thereafter, the trustees met and, over the objection of Mr. Charity, approved amended plans for the three dwellings long after construction had begun. We find that defendant Boyd had a personal interest in the construction of these three houses and that

the trustees condoned the construction thereof without regard to their prior duty to approve plans.

■ There was material evidence concerning the relationship of the parties in their dealings. A problem arose concerning control of surface water and an agreement was reached whereby an adjoining owner would pay half of the expense and the other half would be shared between the trustees, who were to pay one-eighth, and Mr. Boyd who was to pay the remaining three-eighths. When the contract was presented for execution to the trustees by the lawyer whom Mr. Boyd had employed and subsequently paid, Mr. Boyd was not named as a party. Mr. Charity insisted that Mr. Boyd be made a party or that he at least execute a contemporaneous agreement with the trustees as to his share of the expense. Mr. Boyd declined to do this but he did write a confirming letter, not to the trustees but to the lawyer. In December of 1954 Mr. Boyd was asked to call a meeting of the trustees to discuss current problems of the lot-owners and he declined to do so until mid-March because he was too busy but, subsequently, did call a meeting in February after the trustees were presented with a written petition of the lot-owners. Mr. Giesler did nothing about the petition. The plaintiffs had objected to the trustees about construction of new homes with overhead pole lines, rather than underground conduits which served the older homes, but Mr. Boyd felt that that was his own decision, based on whether it would be profitable to him. Mr. Boyd characterized the trustees' February 7th meeting with the property owners as one where they "blew off steam". In reference to Mr. Charity writing letters to him about the trustees' affairs, Mr. Boyd referred to him as "letter-writing Charity". Mr. Giesler was acquiescent to Mr. Boyd in most all his decisions and activities and habitually teamed with him in opposition to Mr. Charity. To us the evidence clearly shows that a marked animosity has arisen between Mr. Boyd and Mr. Giesler on the one hand and Mr. Charity and the plaintiffs on the other.

Bearing in mind the guiding principles of equity concerning the duties of trustees, as mentioned in the Boland, Bilton and White cases, supra, we look now at the defendant trustees' conduct as a whole. We do not believe that their conduct can be classified as a series of mistakes in judgment or trivial breaches of the trust, but that it constituted a marked and sustained breach of their duty to act with "utmost integrity and loyalty". Defendant trustees had the power and duty to conduct the affairs of Green Acres for the benefit of all the land owners. Their manner of handling records and meetings and the way in which they permitted construction of new dwellings was marked by laxity and inefficiency, to the detriment of plaintiffs. The manner of making assessments was arbitrary and so designed as to benefit Mr. Boyd, at the expense of plaintiffs. The opening of the thirty-foot strip and Green Acres Road to Mr. Boyd's purchasers similarly showed the use of the trusteeship as a means of serving Mr. Boyd's self-interest. We believe that this conduct shows a want of fidelity on the part of defendants, that the property rights of plaintiffs are thereby endangered and that there is a clear necessity for defendants' removal. Shelton v. McHaney, 343 Mo. 119, 119 S.W.2d 951, loc. cit. 954; Gartside v. Gartside, 113 Mo. 348, 20 S.W. 669. Interwoven with this conduct, there is an abiding antagonism between the parties and this ill-feeling, coupled with the existing conflict of interest and inefficiency, fortifies our decision that defendants should be removed. Selleck v. Hawley, 331 Mo. 1038, 56 S.W.2d 387, loc. cit. 396; Gaston v. Hayden, 98 Mo.App. 683, 73 S.W. 938.

■■ A question arises as to the scope of this appeal. The petition prays only for the removal of defendants as trustees and the appointment of two successor trustees. The answer seeks declarations by the court as to Mr. Boyd's authority to ap-

point successor trustees, contending that he did not have such right and that therefore he alone is a trustee; and as to whether any Boyd property in Green Acres was subject to assessment by the trustees. In its decree the trial court first recited numerous findings, including findings adverse to defendants on these two questions. These recitals were followed by the decretal portion which dealt only with removing and replacing defendants as trustees. The decretal portion did not touch upon the issues of trustee succession nor assessment of the Boyd property, but both parties have briefed these questions. The force of a decree does not lie in its recitals but in the mandatory or decretal portion thereof, which adjudicates and determines the issues and defines and settles the subject matter of the controversy. Casper v. Lee, 362 Mo. 927, 245 S.W.2d 132, loc. cit. 141; 49 C.J.S., Judgments, § 71. The question now before us is not whether the trial court should have fully ruled these two other questions but whether we should now do so. As said by the Supreme Court in Lins v. Lenhardt, 127 Mo. 271, 29 S.W. 1025, 1027, "When an equity cause comes up to this court, it is for hearing de novo, and it will be considered for the most part as if it had originated here, and was to be heard for the first time."

We believe these two matters were properly omitted from the decretal portion of the decree, and that it is neither necessary nor proper that we specifically rule them. The issue in this case is whether defendants should be removed as trustees. If so, then it is immaterial to them, as former trustees, whether defendant Boyd properly appointed defendant Giesler or Mr. Charity as trustees. Equity will not rule a question that is not material to the issues. Lortz v. Rose, 346 Mo. 1212, 145 S.W.2d 385. As stated, defendants also sought a broad declaration as to whether the Boyd land in Green Acres was subject to annual assessments, and in its findings the trial court so found. That finding was, of course, incidental to the question of misconduct on the part of the trustees in omitting all Boyd land from assessments. We believe it would be improper for us to make a declaration on this question, particularly for these reasons: (1) Such a decree would not be binding on lot owners in Green Acres who were not parties to this suit, (2) the defendants concede in their brief that lots which Boyd has platted are subject to assessment if benefited, and (3) if defendants are removed as trustees, the question is immaterial to them in that capacity.

In thus limiting our ruling, we are following the established principle that equity "will not undertake to determine academic, moot, or abstract questions, to declare future rights or lay down rules for future conduct of individuals, or simply advise parties, * * *." This opinion should be considered in the light of that principle, and the findings we make are limited to their application to the issue of removal of the trustees.

The decree of the trial court in removing the defendants as trustees, restraining them from exercising further functions as such, and appointing successor trustees should be and is affirmed and adopted as the decree of this court.

ANDERSON, P. J., and MATTHES, J., concur.