Eugene GEORGE et al., Plaintiffs-
Appellants,

v.

Percy G. DICKINSON, Defendant-
Respondent.

No. 34946.

Missouri Court of Appeals,
St. Louis District,
Division One.

Jan. 8, 1974.

Jenny, Cole & Eckelkamp, Union, Cox & Moffitt, St. Louis, for plaintiffs-appellants.

Dearing, Richeson, Roberts & Wegmann, Nicholas G. Gasaway, Hillsboro, for defendant-respondent.

SIMEONE, Judge.

This is an appeal by plaintiffs-appellants, Eugene George and his wife Mary, from a judgment of the circuit court of Franklin County entered on June 30, 1972 in favor of defendant-respondent, Percy G. Dickinson on Count II of his counterclaim declaring that the defendant had an easement by prescription over the appellants'—Georges' property.

The Georges and Dickinson own adjoining property in Franklin County. The Georges own some 174 acres of land on which they did not live and Dickinson owns 80 acres. The Georges' land lies west of Dickinson's and a portion of it adjoins the land of Dickinson. On the Georges' property is located a house, a barn and a chicken house all in the southwest corner of the southeast one-quarter of the northwest quarter of section 24 in Twp. 41, N., Range 1 East of the fifth P. M. The home is located near highway 47 and there is a driveway off highway 47 to the home. Although the Georges did not live on this property, they had had a tenant living on the farm and some children living in the area. Dickinson's property consisting of 80 acres in the north ½ of the N.E. ¼ of section 25 is located east of the Georges' land and about a quarter mile from the Georges' home. A "road" about twenty feet wide which is the subject of this controversy runs from the western portion of section 24 of the Georges' property eastwardly toward the Dickinson property. A fence runs along the northern part of the "road". At one time the "road" was fenced on both sides but the fence on the south side fell several years ago. This "road" is the subject of the controversy here and it must be determined whether Mr. Dickinson has a prescriptive easement over the Georges' property for the use of this "road".

This action began by the filing of a petition by the Georges seeking an injunction alleging that they were the owners of certain described property which they acquired on October 17, 1946, and that the lands along Highway 47 have been fenced "for a long time." The Georges alleged that sometime after January, 1969, Dickinson cut the fence on the Georges' land and has driven vehicles across the lands causing deep ruts and depressions; that sand and gravel and other material have been deposited on the "road" by the defendant or by his direction.

The Georges prayed that the defendant be restrained from using the lands of the Georges as a roadway, and that unless Dickinson is enjoined the usage will ripen into adverse possession. Plaintiffs also sought to require Dickinson to replace the fence, to restore the land to the condition it was, and sought damages allegedly suffered. Dickinson filed an answer and counterclaim. The counterclaim contained three counts—Count I alleged that the

"road" is a "public road"; Count II alleged that the "road" has been used for more than 80 years and that the use having been open, notorious, adverse, hostile, continuous and under color or right and title, the defendant has an easement by prescription over the road; Count III sought a private way of necessity.

Issues were joined and after a transfer of judge, trial began on June 8, 1972. The evidence is at best contradictory and confusing. References are made to the road or fence as being "here" thus not giving us the benefit of a clear record. As best we can gather from the testimony, Mr. George purchased his property from his uncle, Rollie George, in 1946. He was later married. On the property, as stated, is located a home, barn and chicken house. There is also a driveway entrance to Highway 47 from the home. A fence is located on the property, apparently located on the north side of the "road" which runs east and west, at least near the barn some 500–600 feet east. The fence came up near the home and then proceeded north. Near the house it had an offset so that it did not enclose the driveway. The offset was approximately the width of the driveway. Along the road there were two "gaps" or gates; one located near the easterly boundary line near the Dickinson property and one located near the barn, on the western side of section 24 of the Georges' land. Mr. George testified that the gate near the barn had been there "since I owned the place" and the gate at the eastern boundary line had been there for "many, many years." Those portions of section 24 and 25 which were located on both sides of the "road" were used for pasture and running cattle. In order to use the land for pasture, Mr. George testified that the "gaps" were continually closed. He indicated that there was no "road" through the field and the field was in pasture grass.

In January, 1969, Mr. George stated that Mr. Dickinson "came in and tore my gates down and graveled him a road back [east] to his property." He indicated that prior to that time there was no gravel in the area parallel to the fence. He indicated that even prior to the time of his purchase in 1946 that the "gaps" had been there, and that they were always closed. Since 1946 he continually kept the gaps up so they would be open and closed. Many photographs were introduced, many of which showed, according to Mr. George, the condition of the ground prior to the graveling by Dickinson.

Prior to the action taken by Dickinson in tearing down the gates and graveling the area, he told Mr. George that he would not open and close the gates, and informed George that he was "going to gravel that road."

As a result of the action taken by Dickinson, George alleged the tenant left and Mr. George was required to make a sufficient pasture on another side of the farm costing some $1,000. And as a result, there is traffic at all hours of the day and night, vehicles block his driveway preventing him from getting in and out of the shed and barn, and vehicles run over the fields.

On cross-examination, Mr. George acknowledged that the prior owner of the Dickinson tract, William C. Bull, walked along the road and drove vehicles back to his (later Dickinson's) land. He did not ask permission but did it "of his own accord,"[1] and "never" according to George put gravel on it.

Mr. Dickinson purchased his 80 acres in December, 1968, from Mr. William C. Bull. Mr. Bull acquired the 80 acres in 1941 from Mr. Wilbert Nappier, and "got into [his] property" on weekends on the same road. He testified that for a few years his mother and brother lived on the property.

---

1. Mr. George later stated, however, that Mr. Bull did ask permission when he went through. He only drove through during dry weather, in the summer months.

At the time that the Georges owned the property there were no gates placed on the road. It was not until 1965 when Mr. George asked Mr. Bull if he "could use it, wanted to pasture the roadway down through there . . ." that gates were put up. No permission to go through the property was ever obtained by him and vehicles would go through "all the time." Over a period of years from 1960 until he sold the property to Mr. Dickinson, Mr. Bull hauled in "thirty or forty trailerloads" of gravel for the road in the ruts where the wheels went and put in a culvert.

Prior to the time Mr. Bull owned the Dickinson's property, it was owned by an elderly gentleman, Mr. Wilbert Nappier. Mr. Nappier and his family owned the property from 1908 until 1941 when it was sold to Bull. During the period of time from 1924 and 1941 the family went onto the property "almost every weekend" and since 1941 went back many times. They got to the property "down the road from 47 to the house." During all this time he never asked permission of anyone to use the roadway, and there were never any "gaps" or gates. On cross-examination he indicated that the road was a graveled road but not solidly. ". . . [I]t was what you would call a farm road."

Mr. Dickinson testified and admitted that he hauled gravel onto the "road", about seven tons, and cut brush. He admitted he cut the gates across the roadway, and that he told one Huff to gravel the road. He has been using the road and intends to continue to use it. Other witnesses testified that the road was a "byroad" and there was a gate for years near the Georges' home, and at the east line; according to one witness since 1946, and according to another since the early 1930's. At the time of the purchase there was a "gap" at the house and at the east end of the George property.

On June 8, 1972, the trial court found that the plaintiffs were not entitled to injunctive relief against the defendant and found the issues in favor of the plaintiff on Count I of the counterclaim. On Count II, relating to the prescriptive easement, the court found the issues in favor of the defendant and that the "defendant and his predecessors in title have used said road for a long period of years, more than thirty-five (35) years, and that said use has been open, notorious, adverse, hostile, continuous and under color and claim of right and title," that the defendant and his predecessors have established an easement by prescription over the roadway, forty feet in width and that the defendant and those claiming through him are entitled to the "free, open, uninterrupted and untrammeled use of the said roadway and every part thereof."

Having found in favor of the defendant on Count II, the court found that the defendant is not entitled to a private road of necessity.

The court restrained the plaintiffs from obstructing the defendant from the free, open, uninterrupted and conditional use of the road.

After appropriate after-trial motions were filed by the plaintiffs and overruled, plaintiffs appealed.

In essence appellants contend that the court erred in finding an easement by prescription because: (1) the court should not have considered evidence relating to a county road and a way of necessity, (2) a finding of a prescriptive easement is not favored in the law, (3) the defendant has the burden of establishing the easement and that presumably the defendant did not sustain his burden of showing an open, adverse, exclusive and uninterrupted use for ten years for mere permissive use cannot ripen into an easement and if there is doubt it must be resolved in favor of the free use of one's land, (4) that the evidence did not justify the finding that there was an easement by prescription because any use was with permission and not adverse or that the use was under a claim of right and in defiance of the plaintiff's title,

and because prior to the purchase of the property by Dickinson, the "road" was not of a permanent nature; (5) that even if there was a prescriptive easement before 1946 it was extinguished by abandonment prior to the time Dickinson acquired the property, (6) that the easement was overburdened by the defendant and there was an increase in servitude, and that if there exists a prescription, it should be limited to the same extent as the earlier users so that the defendant should be required to open and close the gaps and permitted to travel across the "road" with vehicles when dry and walk when wet. They also contend that plaintiffs are entitled to the equitable relief prayed for in their petition.

The defendant respondent contends that the court did not err in finding that defendant established a prescriptive easement free and clear of all gates. Respondent urges us that if we sustain the trial court's finding of a prescriptive easement, the defendant should have the right to maintain and repair the roadway.[2]

This is an equitable proceeding. Our review must be de novo upon the law and the evidence and we are to reach our own conclusions, although we accord due deference to the findings of the trial court and its opportunity to judge the credibility of the witness; we are admonished, however, not to set aside the findings and judgment of the trial court unless the judgment is clearly erroneous. Rule 73.01(d), V.A.M.R

There is no doubt today that an easement by prescription may arise when certain conditions are fulfilled. Originally, a prescriptive easement to be enforceable must have existed "for a time whereof the memory of man runneth not to the contrary." George v. Crosno, 254 S.W.2d 30, 34 (Mo.App.1952); see discussion in Riggs v. City of Springfield, 344 Mo. 420, 126 S. W.2d 1144, 1149 (banc 1939). Today such right is now declared to be substantially the same in quality and characteristics as adverse possession, which will give title to the land. George v. Crosno, *supra,* 254 S. W.2d at 34.

■ There are certain fundamental, oft-quoted principles and essentials required to constitute an easement by prescription. They are stated in many ways and forms. As stated in Anthony v. Kennard Bldg. Co., 188 Mo. 704, 87 S.W. 921, 924 (1905) and relied on in Roberts v. Quisenberry, 362 Mo. 404, 242 S.W.2d 26 (1951), "The four essential facts . . . to sustain their claim to an easement by prescription are, first, user for the prescribed period; second, that the user was adverse; third, that it was under a claim of right; fourth, notice to the owner of the user, and of its character and of the claims of right."[3] The use must be open, visible, continuous, uninterrupted for the required period of time and adverse under a claim of right, Miller v. Berry, 270 S.W.2d 666, 668 (Mo.App.1954), and notice to the owner of the land of the use and the claim of right. Moravek v. Ocsody, 456 S.W.2d 619, 625 (Mo.App.1970). Notice may be inferred from the circumstances and express notice is not necessary. Long continued use alone will not create a prescriptive right, nor will mere permissive use of the land ripen into an easement. Seested v. Applegate, 26 S.W.2d 796, 799 (Mo.App. 1930). The user asserted "must not only have been open, visible, continuous and uninterrupted for ten years or more, but it must also have been adverse[4] and under a

---

**2.** This was not presented to nor ruled upon by the trial court; hence we do not undertake to decide this question.

**3.** One of the best summaries of the law in this area is Miller v. Berry, 270 S.W.2d 666 (Mo. App.1954).

**4.** Mere use is not necessarily an adverse use. A use of land is adverse to the owner when it is not made in subordination to him and is open and notorious. Dalton v. Johnson, 320 S.W.2d 569 (Mo.1959); Jacobs v. Brewster, 354 Mo. 729, 190 S.W.2d 894, 897 (1945). Adverse means that the one making the use shall not recognize in those as against whom it is claimed to be adverse an authority either to prevent or to permit its continuance. It is the nonrecognition of such authority at the time the use is made which determines whether it is adverse. McDougall v. Castelli, Mo.App., 501 S.W.2d 855 (1973).

claim of right [5] of which the owner of the property had actual or constructive notice." Bridle Trail Association v. O'Shanick, 290 S.W.2d 401, 405 (Mo.App.1956).

One who claims the easement has the burden of establishing all of the essential requirements by clear and positive evidence. Bridle Trail Association v. O'Shanick, *supra* at 405. Doubt as to the character of the use is to be resolved in favor of the free and untrammeled use of the land, for courts hesitate to infringe upon rights normally incident to the absolute ownership of land. Where, however, there is a use for a long period of time an inference arises that the use is adverse, and the proof of such use without evidence to explain how it began raises the inference it was adverse under a claim of right and shifts the burden to the owner to show that it was by virtue of some license. Gerstner v. Payne, 160 Mo.App. 289, 142 S.W. 794 (1911); Fassold v. Schamburg, 350 Mo. 464, 166 S.W.2d 571, 572 (1942); cf. Miller v. Berry, *supra* 270 S.W.2d at 668.

Each case, of course, must be determined upon its own facts and it is our duty to determine whether the trial court was in error in finding that the defendant, Dickinson, and his predecessors established an easement by prescription over the roadway and that he was entitled to the free and open use of the roadway.

We have examined the whole of the record—all of the evidence, the transcript, exhibits, briefs and cases cited therein and conclude that the trial court was not clearly erroneous in making the findings and judgment in favor of the defendant—Dickinson.

It is clear that the trial court could not have found the roadway to be a county road. There is no evidence that it was ever opened by the county nor was any public labor or moneys spent on it. Neither was there sufficient evidence to show that the road was a way of necessity. We do not believe as appellant contends that the introduction of such evidence so infected the issue of whether or not a prescriptive easement existed. The only issue, therefore, is whether the trial court was justified in finding a prescriptive easement in favor of Dickinson and his predecessors.

The testimony is quite contradictory, but we defer to the opportunity of the trial court to judge the credibility of the witnesses. There was substantial evidence that for a long period of time, even prior to Mr. George purchasing his property, there was a long-continued use of the "roadway" by Mr. Bull and his predecessors in title and that the defendant and his predecessors in title acquired an easement by prescription. The easement acquired became appurtenant to the dominant estate and passed to Dickinson. Mr. Bull testified, contrary to Mr. George, that there were no gates on the property at the time Mr. George owned the property at least until 1965. The "roadway" was used by Mr. Bull and the Nappiers without even asking permission to use the roadway. This use was with the knowledge of Mr. George. Mr. Bull testified that he hauled gravel onto the road over a period of years, and there is no evidence to indicate that this was done with the permission of Mr. George. There is evidence that when the gates were put up, Mr. George asked Mr. Bull if "he could use it, wanted to pasture the roadway down through there." No permission was obtained and vehicles would go through there.

These activities over the years satisfy the requirements to establish a prescriptive

---

5. A claim of right in essence rests in intent. "As there is no window through which we may look into the soul of a man and use our eyesight in spying out his intent, the proof of intent . . . rests in acts and words. There may be cases in which acts speak louder than words—where the thing done drowns out the thing said." Sanford v. Kern, 233 Mo. 616, 122 S.W. 1051, 1055 (1909). The claim of right need not be expressed in words or that the adverse party expressly admit his knowledge of it. These facts may be inferred from the use. It is sufficient that the person acts in such a manner as clearly indicates he claims title to the easement. Moravek v. Ocsody, *supra* 456 S.W.2d at 625.

**664**

easement. The acts were open, visible, continuous, uninterrupted for ten years or more, adverse and under a claim of right as those terms are defined in the law.

 There was no abandonment of the easement as appellant contends. While an easement may be extinguished by abandonment, Dalton v. Johnson, *supra*, abandonment is a question of fact and must be proved by evidence of an intention to abandon as well as the act by which that intention is put into effect. To constitute an abandonment there must be a relinquishment of possession with the intent to terminate the easement. Even a failure to use does not constitute an abandonment. There was, under the evidence, no abandonment here.

The appellants urge that if an easement by prescription be sustained, it be limited to the same extent and under the same conditions as the earlier users prior to Dickinson so that the defendant may use the roadway but be required to open and close the "gaps" and be permitted to travel across with vehicles when dry and walk across when wet. In effect appellants contend that the owner of the dominant estate cannot increase the servitude impressed or change its character.

But the evidence is sufficient to show and the trial court found in effect that a prescriptive easement was acquired free of the closing and opening of the gaps. There is sufficient evidence to show that there were no gaps or gates for a long period of time sufficient to establish a prescriptive right without gaps or gates. Although the use was by vehicle in dry weather and walking in wet weather, the use was free and open without gates. Although Mr. George testified that he maintained the gaps at each end of his property since he acquired his farm in 1946, there was substantial evidence that the gates were not placed until 1965. Mr. Nappier also testified there were no gates across the roadway. There was evidence to show that Mr. Bull placed gravel on the "road-way" from about 1960 until he sold the place to the defendant. The trial court therefore did not err in its findings as to this point urged by the appellants.

Mr. and Mrs. George testified that cars block their driveway, go over their fields and are there at all hours. These facts are not determinative of the question of a prescriptive easement over their property. But such occurrences, if they exist and continue, give rise to ample remedies.

We have concluded under this record that the trial court did not err. The trial court heard all the evidence, and was in a position to appreciate it. The trial court found that the evidence established a prescriptive right in favor of the defendant. We find that the trial court's finding and judgment was not clearly erroneous.

The judgment is affirmed.

DOWD, C. J., and KELLY, J., concur.